Our next case is number 2010-1310, Washington International Insurance v. United States. Mr. Vakarix. Vakarix, yes, your honor. You may proceed. Thank you. If it pleases the court, my name is Tom Vakarix. I'm appearing here today on behalf of Washington International Insurance Corporation. Washington International is a surety to the importer of record in the review below. I'm going to ask you a preliminary question on that. Certainly. The surety's standing to maintain this suit. As far as I can tell, there's an opinion of the court of international trade in a case called Lincoln General Insurance Company. Correct.  Yes, sir. In that case, the Department of Justice argued you didn't have standing. And as far as I can tell, this court has never decided that question, has it? You may or may not know the answer to that. This court has not addressed that question. Perhaps, hopefully, when the Department of Justice gets up to respond to you, they may be able to tell us whether they now concede standing, or whether they take no position on it, or whether they think you don't have standing. Thank you, Your Honor. And just to point out that the issue was reviewed extensively at the Commerce Department, and Commerce ultimately agreed to permit us to participate in the review below. But you're correct, this court has not yet addressed that issue. Another key company here is Zuzhou, X-U-Z-H-O-U. They were the respondent below. They received all the questionnaires. They provided all the information. The surety's responsible for the dumping, didn't it? Exactly, Your Honor. That's why we are here in the stead of the importer of record, which is liable. They defaulted and disappeared, and the surety, Washington International, was presented with a huge bill. It's clear that this whole thing has a significant financial impact on your client. Enormous, Your Honor. Enormous. Into the millions. And our primary concern here, why we're here today primarily, is because of this huge 188% total adverse facts available rate. And we implore this court to give every consideration, as a matter of record evidence, to do everything that can be done, of course within the law, to reduce that rate. Assuming arguenda, we'll do everything we possibly can for both sides. Thank you, Your Honor. That's more than fair. Assuming arguenda, Congress properly did decide to go total AFA, there are two or three serious problems. Congress relied upon Roan-Plank, a 20-year-old Federal Circuit case, which held, and which has had a continued life well beyond what we submit as justified. And Roan-Plank held that it's just common sense. Pick the highest rate you can find and use that as total adverse facts available. Four years after Roan-Plank, the statute was amended with respect to the best information available, now it's adverse facts available. And this court addressed those changes in Gallant Ocean and in DeSeto. And in those two cases, this court put, we submit, severe restrictions on Roan-Plank. Almost to the point between the statutory amendments and the later decisions by this court, which basically say, it's not just common sense. You have to find a rational relationship between the total adverse facts available rate and the actual rate of the respondent that had been calculated by the department. Here we have an actual rate of zero in the immediately preceding review, the 0405 review. 0506 review, we now have a 188%. What is the highest rate that was calculated for other respondents? In the final results, Congress selected the highest rate in a previous segment of the proceeding. That was 223%. No, no, that was against you, but I'm talking about for other respondents. Oh, the highest rate? Yeah, the highest rate that was calculated for other respondents. 50%, 5-0. Which year was that, the same year? I don't have that right in front of me, but it was within the last six or seven years. It's not the same year? No, the same year there were two respondents, that was double digits. That was around, I think, 15%, 1-5. So the same review that we received, the 188, the remaining respondent received a 1-5%. So it's troublesome. Anyway, the law, and there are conflicts below at the CIT. Some courts go with, well just take, roll the blanket and say, yeah, that's fine, you can do that. Other courts have gone the other way and said, no, you've got to have a reasonable relationship. They followed DeSecco and they followed Dale and Osher. So it needs to be clarified. Congress has since the final results backed away from Roe and Polank. Roe and Polank is cited extensively in their final results, but if you look at their appellate papers, it's not there anymore. It's danced around. DeSecco said it's got to be a reasonably accurate estimate of the respondent's actual rate, plus a little bit built in as a deterrent to future noncompliance. 188% has no reasonable, rational relationship to the zero rate that Xu Xiao earned in the 04-05 review. It's not a question as to whether it bears a rational relationship to the other rates that were imposed on your importer. The question is whether it bears a rational relationship to rates that are imposed either on your importer or other importers. Well, in that situation then, if you go back to all the Crawfish reviews, including the original investigation, the highest calculated rate is 50%. So we're almost four times that. And our own rate is zero. So even in that context, it's difficult to, we submit that there's no reasonable relationship. It is a clear intention by the Congress Department to simply apply the highest possible rate they can find. Now what they did here is interesting. In the final results, Congress followed its well-established practice, which is to go back to the prior segments of the proceedings, and then to select the highest rate previously calculated in a Crawfish segment. They did that in the final results, and that was 223%. Now, the lower court said, now, you haven't corroborated that. There's something wrong there. You've got to come back with a new corroboration, because what you presented is not sufficient. So what did they do? They abandoned their well-established practice of going back to prior segments to find an AFA rate, and they decided they're going to calculate a brand new rate for Zusha. And in doing that, no explanation. They just walked away from their well-established practice and said, we're going to calculate a new rate. Is there any way of telling on what basis Congress decided the appropriate duty here was 180 to 80%? I mean, they didn't just flip a coin, did they? Almost. No, but with all due respect, Your Honor, what they did- It must have been based on something. Why was it 188 and not 198 or 161? It must have been based on something. Yes, sir. And the question is, upon what was it based? Okay. What Congress did is they went back to the 0405 review to obtain a normal value. They took the export price from this review based on the sales that had been, in their view, mischaracterized, correct? Right, that's correct. And then they went back and took the normal value from earlier. That's correct, Your Honor. And then they tell us that, well, here we have the normal value from the prior review, we have your U.S. price. From this review, they ran a back-of-the-envelope calculation, came up with 188%. Well, there's a problem with that. There's substantial record evidence we submit that demonstrates they picked the whole crawfish price from the pending review of $3.86 a kilogram and then compared it to the actual normal value from the previous review of $10.46 per kilogram. Now, one, it's counterintuitive that within one review to another, you're going to go from $10.40 to $3.86. The court below recognized, in a couple of instances, very clearly, referencing documents on the record. But the normal value that they took from the prior year was for tails, right? I'm sorry? The normal value they took from the prior years was for tails. For? For crawfish tails. Yes, yes, right, for tails. Let's suppose that we reject your contention and we find that the export price was also for crawfish tails. Is there a problem in taking the normal value from one year and the export price from another year and comparing them? No, Your Honor. No? We don't think there's a problem with that. But that's part of the problem. That doesn't support our argument. Why isn't there a problem? Well, they're going to abutting reviews. One immediately follows the other. Last year, it was $10.40. This year, it's $3.86. Now, if they want to go back, the statute and the cases are pretty clear. They've got a wide panoply of choices that they can make. We're not so much objecting to the $10.40. That was conducted, a number that came out of the review that was conducted by Commerce. We'd be hard-pressed to say that number is an error. But we're very, very certain that the $3.86 number they picked from the current review is wrong. It's a price for a whole crawfish. That seems to be a fact-finding based on their determination that those items were tails. You argue about the FDA identification and the pictures and all that. That sounds very much like a fact-finding issue. We don't find facts. So, is what you're saying that if we reject your contention that those items were for whole crayfish and say you're wrong, we accept the fact that they're for tails, that you lose the case, right? No, Your Honor. No, we don't agree. Because the totality of the evidence demonstrates that the 188% is not reasonably related to the respondent's actual rate. That 188 fails on that alone. And then the calculation that they actually conducted fails on the fact that there's substantial record evidence to show that $3.86 number is whole. So, if you don't want to agree with us there, we submit you still have to go back to DSECO and Gallant Ocean and Rome Palenque and take a look at that and say what they did here was pick the highest margin they could possibly obtain. Why did they change their procedure? Why didn't they just go back... You're saying it has to be corroborated by some other margin with respect to the same product. For the 188? Yes. This court has said it has to be reasonably related. To some other margin. To the respondent's actual margin. Well, but in terms of the corroboration requirement, what can corroborate? They choose a 188. Yes. Suppose they found another margin that was 1-4. Would that be sufficient corroboration? No. Why not? No. First you say it's a matter of fact. All their findings, including the finding as to the price of whole and the price of tail, have to be supported by substantial evidence. They don't get a free pass just because it's a price. You have to go back, resubmit, and look and say is it supported by substantial evidence or is it otherwise contrary to law? It's contrary to law because they abandon a well-established practice. We submit purposely to obtain a triple-digit total adverse facts available. And the practice was to use a margin that was calculated for other response. Yes. The highest margin for the other response. Yes, Your Honor. Which is what they did before the remand. They went back, they took the 223% and said we're happy. We challenged the lower courts that you haven't corroborated it. So they came back with 188 using what we submit as a very, very faulty methodology, using the wrong price. And it is possible. It's not beyond the realm of possibility that they were just so committed to finding these allegedly unreported sales that they went to the 386 and said all right, that's our U.S. price. That's the only way you get 188%. If they don't do that, they're strapped with 50%. Why did they change their methodology? Why didn't they just use the 50%? That's 50 times higher than Zhu Xiao's actual rate. So there's a problem there. Now... I think you're out of time.  Thank you, Your Honor. Good morning. May I please the Court? The focus of this appeal really should be on the Commerce's remand determinations which were sustained by the trial court. Much of the opening brief and the reply brief focused on Commerce's final results, some of which were questioned by the trial court. And Commerce expressly, in terms of the substantial evidence and the underreported sales, Commerce expressly said that even though it disagreed with the trial court's criticisms in certain aspects like the count size and custody... Why don't you address what seems to be the heart of the issue here? And they say 188% bears no relationship to reality when the next highest rate was 50%. Well, first of all, page J43, the trial court explicitly directed Commerce on remand... Are they correct that the next highest rate was 50%? In an earlier segment of the review, in the prior review. In the current review... So you have no rate which is higher than 50% in comparison? Other than the China-wide rate that Commerce previously selected, that's true. But as Commerce explained in its... That was the China-wide rate, which is based on the non-cooperation of the Chinese government, and so that's an adverse rate. It was a prior calculated rate. Commerce originally selected that as the highest calculated rate, and the trial court said that was not corroborated. And the trial court, again at page J43, specifically directed Commerce... Did they explain why they came out at 188% rather than 140% or 200%? Oh yes, very clearly, Your Honor. In the remand results, at pages 239 and 240, Commerce explained what it did. It said that it did not want to rely on the highest calculated rate, which was about 50% in the prior segment of the proceeding. Because that would not be sufficiently adverse. There was a substantial number of under-reported sales here. There was substantial lack of cooperation, and I can address the specifics of the challenges based on substantial evidence. But there was significant under-reportage of the sales of crawfish tail meat. And because of that, there was a substantial lack of cooperation, and relying on the prior rate for a cooperating respondent... So they didn't just pull those 188% out of the air and say this is what we're going to... No. It was based on the lowest U.S. price of the under-reported sales in the review. And as Commerce said expressly, there was a substantial number of these sales on page 242 of the remand determination. The number is proprietary, although counsel used it. It says these entries were priced at a certain price per kilogram, which is the same price that was listed in the CPB documents for a significant portion of Shayser's under-reported sales. And this was a significant price. And as Commerce also explained in its adverse facts available memorandum, that price of tail meat was very consistent with right within the range of the prices of tail meat for the other respondents in this review who were not dumping at the height. So why did you end up with a 188% rate by taking the export price from one year and the normal value from another? I mean, it just seems counterintuitive that it would be that huge a margin when there was a zero margin in the prior year and the margins for the other respondents were only in the teens for the period of review. Because the substantial evidence of sales that were never reported, that were basically they were selling crawfish tail meat at the same price as Shayser was, not the other respondents. Shayser was underselling crawfish tail meat at such a degree that it was the same price essentially as whole crawfish. I mean, Your Honor, it's set out in the adverse facts available memorandum. The prices are set out and the range of the prices of the other respondents and Commerce explains how it goes through. So what you're saying is that the 188% rate is solely a function of the remarkably low price that they were selling unreported sales? Yes. It's on page 122 of the joint appendix. This is in the adverse facts available memorandum. Commerce sets out that this is the average entered value of U.S. imports for crawfish tail meat, and this was in a per pound. One of the confusion in the record is that there's... What you seem to be saying is that although seemingly this 188% is somewhat unreasonable at such a high rate, in fact, when you look at all the circumstances of this case, it's reasonable. It's based on the actual... Your Honor, we got an adverse decision in Galant Ocean because it was said that the rate did not bear a commercial reality. There could not be a better commercial reality here because this is reflecting the actual behavior of this respondent in this review. And the... Why don't you take the normal value from the period of review rather than going for the earlier year? Because the cases that mentioned the fact that Commerce can use a calculated rate with a built-in increase for deterrence. And the question is Commerce, you know, that might lead the court to think that the built-in deterrence is like a 10% or 15% kicker for deterrence, but Commerce never does that. Commerce... What was the normal value for the period of review here? Sorry, I'm not... I'm wondering whether the normal value for the period of review was materially different from the normal value for the previous version that you used. The normal value for... Did you understand? Yes. You seem to be attributing this 188% rate entirely to the fact that there was a very low export price for the unreported sales. And what I'm asking you is, well, to some extent is the 188% accounted for by the fact that there was a significant difference between the normal value in the period of review and the normal value for the earlier period. We couldn't calculate the normal value for this review because they didn't cooperate. So they used the normal value for the prior review when they did cooperate. Did you calculate the normal value for other respondents in this period of review? Yes. Cooperating respondents, yes. Was that normal value similar to the normal value that you used from the earlier period of review?  I cannot say for sure, Your Honor. I think it would be similar, but Commerce wanted to use the normal value of the respondent in only the preceding period. This wasn't five years before. This was in the immediately preceding review where they did cooperate. And also it was a new shipper review, which means that it wasn't as fulsome or robust by the nature of the review. It wasn't as fulsome or as robust as a full administrative review. Commerce typically looks at fewer sales in a new shipper review. And it did come out with a zero rate. I'm not casting aspersions, but it can be a business decision that a shipper makes to change dramatically its behavior from one period of review to another. And in this case, there is evidence on the record of substantial underreported sales of crawfish tail meat at a very, very, very low price. What is your contention that it's not likely that the normal value would change from the earlier period? The price that it would sell the tail fish, I don't see why it would. But the point is that its behavior and selling the subject merchandise in the United States. And a lot of the confusion in the briefs are the numbers that Washington International uses. It's comparing its sales of subject and non-subject merchandise, its total sales of all crawfish. And Commerce was comparing the sales of crawfish tail meat that were reported versus the underreported sales. And the underreported sales are very, very substantial. And that is why there was this rate. So this rate is based on evidence in the record. It is based on its own data here. This is not something that Commerce pulled out of the air. I mean, I acknowledge it's a high rate. There's no doubt about that. I don't know if the Court has any other questions. Before you do that, I have one question. What position, if any, does the Department take on standing of the surety? Yes, Your Honor, Your Honor is correct. We did challenge the standing of a surety in Lincoln General, and the Court has not had occasion to address this. In this case, by statute, this defines interest of party, and then Commerce makes an analysis by regulation whether the party participated below. And here Commerce determined administratively that the surety did have standing and allowed the standing. It did have a sufficient interest under the interest of party. It was an interest of party under the statute. Therefore, it allowed the surety to participate in the administrative proceedings. And so by the time the case comes to us at the Department of Justice, we look to see if they were a participating party in the administrative proceedings, and Commerce assured us that they were, and the record bears that out. So we do not challenge their standing. And certainly, we always take a position on standing, Your Honor. If we believe that the surety lacks standing, we would have vigorously challenged it, but we don't challenge it. We do not challenge it. We do not challenge it here, Your Honor. Thank you. New Shipper Reviews. They are as rigorous and robust as any administrative review. Commerce gives a respondent no breaks. There may be fewer sales, but the procedures, the methodology, the mechanisms, the testing, are all identical to a normal administrative review. Now, there was some suggestion that, well, you know, you can get that zero, and then maybe you're going to kind of slip back and head in the wrong direction. The zero was in the 0405 review. In a pending preliminary results of an 0809 review, Commerce gave Zhu Xiao a calculated margin of 5.44%. So you've got two calculated margins by Commerce in the normal course of business, nothing being cute, pulling one thing from another. One is zero, one is 5%. The 188% explodes based on Gallin Ocean and based on DSECO. It just doesn't hold water. The fact that they went back to these numbers is not sacrosanct. The fact that they used the 386 is not sacrosanct. If you look here, this is JA55, and it's a list of all Zhu Xiao POR sales during the period of review. When you talk about the integrity of that 386, which is $1.75 per pound, so this tells you it's $4.75 per pound times 2.2 to convert to kilograms. The point I want to make here is anybody who's been involved in dumping cases know it's all over the place. That's why you have all this controversy now about zeroing, because you have just as many positive margins as you have negative margins. These people compete, cutthroat, against losing sales. You do not see dumped prices that are so uniform. They're all over the place. Everything tells us as counsel that commerce just was bound and determined to stick by this finding that all these $1.75 per pound sales or 386 per kilo are unreported tail meat sales. If you look at the FDA report... So in this chart, starting with the fourth line, all the lines after that, commerce said these are not... That's their position. Yes, you are. Exactly. Let's shift up a little bit to the FDA. You're out of time, so just make whatever points you want to make. One final point is the FDA report. The court below was under the misimpression, as were we, including Washington International, that the final word from the FDA in JA111, that the final word from the FDA was that the entities in question were tail meat, not whole meat. There was confusion. It's explained in our brief. The final word from the FDA was that those entries were whole, and we're concerned that that played a material role in the decision of the court below because the FDA came in first with one finding, then another. The final finding was those entries were whole. Thank you very much. Thank you.